



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

F I L E D

SEP 2 6 2003

MICHAEL E. KUNZ, Clerk
_____ Dep. Clerk

03-5423

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* KARL S. SCHUMANN, and on behalf of the STATES of CALIFORNIA, DELAWARE, THE DISTRICT OF COLUMBIA, FLORIDA, HAWAII, ILLINOIS, LOUISIANA, MASSACHUSETTS, NEVADA, TENNESSEE, TEXAS AND VIRGINIA, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | **COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS** |
| v. | ) ) ) | **FILED UNDER SEAL** |
| MEDCO HEALTH SOLUTIONS, INC., ASTRAZENECA PLC SALIX PHARMACEUTICALS, INC., DUPONT PHARMACEUTICALS COMPANY, BRISTOL-MYERS SQUIBB COMPANY, AND GLAXOSMITHKLINE CORPORATION, | ) ) ) ) ) ) ) | F I L E D SEP 2 6 2003 |
| Defendants. | ) | MICHAEL E. KUNZ, Clerk By _____ Dep. Clerk |

This is an action brought on behalf of the United States of America by Karl S. Schumann,

by and through his attorneys, Fine, Kaplan and Black, R.P.C. and Robins, Kaplan, Miller &

Ciresi, LLP, against the defendants pursuant to the qui tam provisions of the Federal Civil False

Claims Act, 31 U.S.C. § 3729, *et seq.*, the California False Claims Act, CAL. CODE § 12650, *et*

*seq.* (2002), the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, *et*

*seq.* (2001), the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.13, *et seq.*

(2002), the Florida False Claims Act, FLA. STAT. ANN. § 68.081, *et seq.* (2002), the Hawaii

False Claims Act, HAW. REV. STAT. § 661-21, *et seq.* (2002), the Illinois Whistleblower

Reward and Protection Act, 740 ILL. COMP. STAT. ANN. 175/1, *et seq.* (2002), the Louisiana

Medical Assistance Programs Integrity Law, LA. REV. STAT. § 438.1, *et seq.* (2002), the Massachusetts False Claims Act, MASS. ANN. LAWS, ch. 12, § 5A, *et seq.* (2002), the Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. ANN. § 357.010, *et seq.*, (2002), the Tennessee False Claims Act, TENN. CODE ANN. § 4-18-101, *et seq.* (2002), the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181, *et seq.* (2002), the Texas Human Resources Code, TEX. HUM. RES. CODE § 36.001, *et seq.* (2002), and the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, *et seq.* (2002).

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

2.     This Court has personal jurisdiction over the defendants because, among other things, the defendants transact business in this District and engaged in wrongdoing in this District.

3.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

4.     The causes of action alleged herein are timely brought because, among other things, of efforts by the defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## PARTIES

5.     Plaintiff Karl S. Schumann is a registered pharmacist and M.B.A, and Medco's former Vice President of Pharmaceutical Contracting.  Plaintiff resides at 96 Coventry Way, Ringwood, New Jersey.  Plaintiff has been involved in the pharmacy benefit management

industry for approximately ten years. Prior to his employment at Medco, Plaintiff was employed by Advance Paradigm, Inc. fom 1992 through 1999, where he served in several capacities, including as Director of Contracting, Vice President of Contracting, and Vice President of Trade Relations.

6.     Defendant Medco Health Solutions, Inc. (Medco) is organized under the laws of Delaware, with its principal corporate offices at 100 Parsons Pond Drive, Franklin Lakes, New Jersey.   Medco, formerly known as Merck-Medco Managed Care, was a wholly owned subsidiary of the drug manufacturer Merck & Co., but was spun off to become its own entity on or about August 20, 2003.   Medco is in the business of providing prescription drug benefit management services to more than 65 million plan beneficiaries.   It is one of the largest pharmaceutical benefit management companies (PBMs) in the United States.

7.     Defendant AstraZeneca PLC (AZ) is a corporation organized, existing and doing business under and by virtue of the laws of the United Kingdom, with its office and principal place of business located at 15 Stanhope Gate, London W1K 1LN, United Kingdom. AZ was formed in 1999 through the merger of the Swedish pharmaceutical company Astra and the UK company Zeneca. It is now the fourth largest pharmaceutical company in the United States. AZ invents, develops and commercializes products that are designed to fight disease. Its products are concentrated in the areas of gastrointestinal, cardiovascular, cancer, respiratory, central nervous system, pain control and infection.

8.     Defendant Salix Pharmaceuticals, Inc. (Salix) is a Delaware corporation.   The address of Salix's principal executive offices  is 8540 Colonnade Center Drive, Suite 501, Raleigh, North Carolina 27615. Salix is a specialty pharmaceutical company primarily engaged in the purchase of drug products that are nearing commercial viability, focusing particularly on

drugs for gastrointestinal diseases. The company identifies and acquires late-stage pharmaceutical products, thus also acquiring a sufficient amount of safety and efficacy data regarding the treatment of gastrointestinal disease in humans.   Salix manages product development for, and employs its sales and marketing expertise to commercialize, the products it purchases.

9.      Defendant DuPont Pharmaceuticals Company was a manufacturer of pharmaceuticals that was incorporated in Delaware, with offices located at Chestnut Run Plaza, 974 Centre Road, Wilmington, DE 19805. DuPont Pharmaceuticals Company was a subsidiary of E.I. DuPont De Nemours and Company, which is a Delaware corporation with its principal offices located at 1007 Market Street, Wilmington, DE 19898. On June 7, 2001, Bristol-Myers Squibb Company acquired DuPont Pharmaceuticals Company for $7.8 billion. Up until that time, DuPont Pharmaceuticals Company was under the control of its parent, DuPont De Nemours and Company.

10.     Defendant Bristol-Myers Squibb Company (BMS) is a Delaware corporation with its principal corporate offices at 345 Park Avenue, New York, NY.   BMS is a leading U.S. pharmaceutical company, and the manufacturer of several top-selling brand drugs. BMS is one of the leading diversified health and personal care companies in the world; as such it has a wide product range, marketed internationally in many areas. The company's primary focus is the pharmaceutical market, which accounts for over 80% of annual sales.   BMS produces and markets a range of brand pharmaceuticals and consumer medicines, including the drug Coumadin, throughout the United States, including within this judicial district.

11.     Defendant GlaxoSmithKline Corporation is a United Kingdom corporation, with its principal offices located at Glaxo Wellcome House, Berkeley Avenue, Grenford, Middlesex,

UB6 ONN, United Kingdom.  GlaxoSmithKline is one of the world's leading pharmaceutical companies, with operations based in the U.S.  GlaxoSmithKline was formed via the merger of Glaxo Wellcome and SmithKline Beecham, which was a Pennsylvania corporation with its principal offices located at One Franklin Plaza, Philadelphia, PA   19102.   Hereinafter, GlaxoSmithKline, Glaxo Wellcome and SmithKline Beecham are collectively referred to as "Glaxo."

## INTRODUCTION

12.    At all times material hereto, defendants AZ and Salix have presented, or caused to be presented, false claims seeking reimbursement for their brand name drugs, including Prilosec, Nexium and Colazal, from Medicaid and PHS entities, defined below, at prices other than the "best price" required by statute.

13.    At all times material hereto, defendant Medco has aided and abetted AZ and Salix in evading the "best price" statute, and in presenting false claims to Medicaid and PHS entities for reimbursement, by assisting the aforementioned manufacturers in falsely reclassifying rebates and discounts on their products as "data" or "services" fees, or "educational grants."

14.    Additionally, at all times material hereto, defendants AZ, Salix, DuPont, BMS, and Glaxo have paid kickback monies, or given products of value tied to drug purchases, to both defendant Medco and one of Medco's major plan clients, Blue Cross Blue Shield of Western Pennsylvania, better known as Highmark.  These kickbacks were provided to induce Medco to give the manufacturers' products formulary placement and promotion, in order to induce Medco's and Highmark's customers, including federal and state/local government plans, to purchase those products.  The kickbacks given to Medco and Highmark were provided at the expense of their federal and state/local government plans, as set forth in more detail below.

5

**BACKGROUND**

15.    In 1965, Congress enacted Title XIX of the Social Security Act ("Medicaid" or the "Medicaid Program") to expand the nation's medical assistance program for the needy and medically needy aged, blind, disabled, and families with dependent children.  42 U.S.C. §§ 1396-1396v.  The Medicaid Program was funded by both federal and state monies, collectively referred to as "Medicaid Funds," with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b; 1396d(b).  Each State was permitted, within certain parameters, to design its own medical assistance plan, subject to approval by HHS.  42 U.S.C. § 1396a.  Among other forms of medical assistance, the States were permitted to provide medical assistance from the Medicaid Funds to eligible persons for outpatient prescription drugs.   42 U.S.C. §§ 1396a(10)(A); 1396d(a)(12).

16.    HHS is an agency of the United States and was responsible for the administration, supervision and funding of the federal Medicaid Program.   The Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of that agency that was directly responsible for administering the federal Medicaid Program, including review and approval of the individual State medical assistance plans.

17.    In 1990, Congress enacted the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, to attempt to control exploding Medicaid drug costs.  Under this program, each drug manufacturer voluntarily entered into an agreement with HCFA in which it agreed to pay rebates to the States based on the utilization of its drug products in exchange for having those drug products covered by the State plans and reimbursed through Medicaid Funds.  42 U.S.C. § 1396r-8(a)(1).

18.     Under the Medicaid Rebate Program and the rebate agreement with HCFA, a participating drug manufacturer was required:

(a)     to report to HCFA on a quarterly basis its "best price" for single source and innovator multiple source drugs, defined as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, non-profit entity or governmental entity within the United States," with certain specified statutory exclusions.  42 U.S.C. § 1396r-8(c)(1)(C)(i)(emphasis added). Best price was to be determined  *"inclusive of cash discounts"* or *"free goods that are contingent on any purchase requirements."*  42 U.S.C. § 1396r-8(c)(1)(C)(ii)(I)(emphasis added).

(b)     to pay to each State plan a quarterly rebate with respect to single source and innovator multiple source drugs equal to the product of (a) the units of each dosage form and strength paid for under the State plan during the rebate period as reported by the state, and (b) the greater of (i) the difference between the average manufacturer price and the best price, or (ii) a minimum rebate percentage of the average manufacturer price.  42 U.S.C. § 1396r-8(c)(1)(A).

19.     On information and belief, defendants AZ and Salix entered into Medicaid rebate agreements with HCFA.  At all material times, AZ and Salix had numerous single source drugs for which they reported best price to HCFA, and paid rebates to states under the Medicaid Rebate Program, including Prilosec, Nexium and Colazal.

7

20.    As AZ and Salix knew and  understood, the purpose of the Medicaid Rebate Program was to ensure that Medicaid, the nation's medical assistance program for the poor, received the lowest price available for its drugs to certain other purchasers, including specifically prices and discounts that the aforementioned manufacturers made available to Medco and/or Highmark.

21.    In 1992, Congress enacted Section 340B of the Public Health Service ("PHS") Act, known as the Drug Pricing Program, to provide drug price protection for certain PHS entities that receive federal funds.  42 U.S.C. § 256b.  PHS entities include such safety net programs as black lung clinics, State operated AIDS drug purchasing assistance programs, hemophilia diagnostic treatment centers, urban Indian organizations, and disproportionate share hospitals, all as further defined in the Drug Pricing Program.  42 U.S.C. § 256b(a)(4).

22.    Under the Drug Pricing Program, drug  manufacturers were required to enter into an agreement with HHS, and to agree that the amount required to be paid (taking into account any rebate or discount) by the PHS entities for covered drugs did not exceed the average manufacturer price, as reported to HCFA under the Medicaid Rebate Program in the previous calendar quarter, minus a specified rebate percentage.  42 U.S.C. § 256b(a)(1).  For each covered outpatient drug, the rebate percentage was equal to the average rebate required under the Medicaid Rebate Program during the preceding calendar quarter, divided by the average manufacturer price for the drug during such quarter.  42 U.S.C. §§ 256b(a)(2).

23.    AZ and Salix entered into agreements with HHS under the Drug Pricing Program. At all relevant times, these manufacturers required the PHS entities to pay for drug products at prices that was derived in part from the amount of Medicaid rebates AZ and Salix had paid in the preceding calendar quarter for each drug.

8

## FACTUAL ALLEGATIONS

24.     PBMs, or pharmacy benefit managers, such as Medco, exercise a critical role in the delivery of prescription drugs to more than a hundred million Americans. Acting as a middleman between health plan sponsors, such as Blue Cross Blue Shield plans, and drug manufacturers, PBMs exert their power to influence drug product selection. Accordingly, being in the favor of PBMs is vitally important to pharmaceutical manufacturers.

25.     One means by which PBMs exert their influence is via the promulgation of drug "formularies," or lists of drugs that the PBMs sponsors agree to cover under their drug benefit programs. The inclusion of a given drug product on a large PBM's formularies has generally been perceived by manufacturers as a guarantee that utilization and sales for that drug will increase. For a drug to become a blockbuster drug, formulary inclusion is critical. Blockbuster drugs generate millions of dollars of revenue for their makers. By contrast, exclusion of a drug from a large PBM's formularies assures low utilization, and low revenues.

26.     Medco, which provides prescription drug benefit management services to more than 65 million plan beneficiaries, is one of the largest PBMs in the United States.

27.     Medco counts the following federal plans among its customers: TRICARE; the Federal Employees Health Benefit Program (FEHBP); the National Association of Letter Carriers (NALC); the American Postal Workers Union (APWU); the Special Agents Mutual Benefit Association (SAMBA); the Retired Military Officers; the National Mail-Order Pharmacy (NMOP) (a mail order pharmacy benefit offered to active duty military beneficiaries and TRICARE beneficiaries); and numerous other federal and state/local government plans.

28.     The above-listed federal plans spend tremendous amounts on their prescription drug benefits. For example, TRICARE, which is the military's health care system, designed to

9

maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, military retirees, and dependents of such retirees, spent approximately $1.3 billion on pharmacy benefits in 1997. Additionally, the FEHBP, which provides health insurance coverage for nearly 8.7 million federal employees, retirees, and their dependents, collectively pays more than $2 billion annually for prescription drug benefits. The FEHBP does so "collectively" because it is a collection of individual health care plans, including the Blue Cross Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan, that are managed by the Office of Personnel Management.

29.    At all times relevant hereto, Medco maintained a Pharmaceutical Contracting Department, which was charged with contracting with pharmaceutical manufacturers regarding the pricing and promotion of certain prescription drugs, including, on information and belief, Prilosec in the first quarter of 2000, Nexium in the first quarter of 2001, Colazal in the second quarter of 2002, Coumadin in or around 1997, and again in the first quarter of 2001, and Zantac in the first quarter of 1997.

30.    Medco separately maintained a Sales & Marketing Department charged with contracting with its insured and self-funded health plan clients.

31.    One of Medco's most important customers was Highmark. Highmark provided a prescription drug benefit for at least 900,000 plan members, including members of federally-funded programs such as Medicare+Choice, and maintained a highly influential formulary, managed by Medco, that was frequently followed by practitioners treating Highmark members and other patients in the Pittsburg, Pennsylvania area.

32.   For drug manufacturers, such as AZ and Salix, getting and/or retaining their products on Highmark's formulary was important because of the Highmark business itself, given that part of Highmark's formulary was closed and, thus, very influential on which drugs were prescribed, and also because the Highmark formulary was generally followed by practitioners in the Pittsburg, Pennsylvania area, and had influence on such practitioners' prescribing habits with regard to non-Highmark members.

## Prilosec: False Claims Regarding Best Price and Kickbacks

33.   AZ marketed a blockbuster drug, Prilosec, used to treat heartburn, prior to its patent expiration in or around 2002. In anticipation of Prilosec's loss of its patented status, and as competing generics were preparing to come on the market, AZ launched a campaign to give Prilosec sales a final push, in order to build and safeguard its profits, on information and belief. In undertaking that campaign, AZ was keenly aware of the need to ensure the placement and promotion of Prilosec on Highmark's formulary, given Highmark's large client base.

34.   Accordingly, in or around the first quarter of 2000, on information and belief, AZ's National Account Representatives met with Medco's high level contracting personnel to discuss how to ensure Prilosec's promotion and sale through Highmark's formulary and customer plans.

35.   On information and belief, after discussion with Highmark regarding the promotion of Prilosec, Medco, on Highmark's behalf, demanded additional price concessions on that drug as quid pro quo for giving the drug a final sales push through Highmark's formulary and customer plans.

36.   At the culmination of negotiations, AZ ascertained that while it could provide Highmark some additional rebates on Prilosec, it could not increase Prilosec rebates to the level

demanded by Highmark, through Medco, without owing substantial additional rebates on Prilosec to the Medicaid program.   Accordingly, on information and belief, AZ offered, and committed, to pay Highmark an additional $500,000 to push Prilosec in some form other than a "rebate."

37.     Thereafter, in or about the first quarter of 2000, Highmark inquired how this promised $500,000 payment would be passed back to it from AZ.  In response, Medco's senior contracting personnel asserted that it would be classified as a "one time educational grant," which would require no study results or documentation, and could be passed to Highmark as a check, or as part of Highmark's rebates, or in some other manner.

38.     On information and belief, this $500,000 payment from AZ to Highmark constituted nothing more than a rebate or discount on Prilosec, but was termed a "one time educational grant" by Medco and AZ, and, therefore, not reported as part of the "best price" on Prilosec.

39.     At all times material hereto, both Medco and AZ understood that cash rebates or discounts on given pharmaceuticals are expressly required to be included in the determination of "best price" for those pharmaceuticals.

40.     Thus, starting in the first quarter of 2000, AZ knowingly excluded this $500,000 payment deemed a "one time educational grant" to Highmark, which was truly only a cash rebate on Prilosec, from its "best price" on Prilosec; knowingly submitted false records or statements to HCFA regarding its "best price" for Prilosec by excluding the $500,000 payment to Highmark,; and knowingly underpaid rebates on Prilosec to the Medicaid Program.

41.     Starting in the first quarter of 2000, Medco aided and abetted AZ in knowingly excluding the $500,000 "one time educational grant" to Highmark from its "best price" on

Prilosec; aided and abetted AZ in knowingly submitting false records or statements to HCFA regarding AZ's "best price" for Prilosec by excluding the $500,000 payment to Highmark; and aided and abetted AZ in knowingly underpaying rebates on Prilosec to the Medicaid Program.

42.      Further, the $500,000 "one time educational grant" paid to Highmark by AZ, which required no studies or documentation for receipt, implicates the federal Anti-Kickback Act, 42 U.S.C. § 1320a-7b (AKA), because it was paid to ensure the promotion and purchase of AZ's drug Prilosec, thereby inducing Highmark's customer plans, including federally-funded programs, to purchase Prilosec.

**Nexium:  False Claims Regarding Best Price and Kickbacks**

43.      Later, in or around the first quarter of 2001, as Prilosec was on the verge of losing patented status, AZ undertook another initiative -- this one geared toward moving market share from Prilosec to its new blockbuster heartburn drug, Nexium -- in order to safeguard its profits when generic Prilosec became available.

44.      As part of its efforts, AZ was keenly aware of the need to ensure Nexium's placement, and exclusive placement, preferably, on Highmark's formulary in advance of Prilosec's patent expiration.  Accordingly, in or around the first quarter of 2001, AZ's National Account representatives met with Medco's high level contracting personnel to discuss how to get Highmark to add Nexium to its formulary, as well as other health plans.

45.      Thereafter, Medco's Formulary Consulting Group set up presentations regarding Nexium's financials with its plans, including Highmark.  The Highmark presentation, upon information and belief, was made during the second quarter of 2001.  The financials presented to Highmark, on information and belief, placed Nexium at the rebate level necessary to lower its net cost to that of generic Prilosec when capped at a 50% MAC price.

46.    "MAC," meaning "maximum allowable cost," prices put a ceiling on the price that pharmacies will be reimbursed by PBMs, including Medco, for a given drug or compound. They exist with respect to drugs that are available in generic form through several manufacturers, in order to take advantage of the significant savings that may be realized when numerous manufacturers compete in selling bioequivalent versions of the same drug.

47.    Highmark, through Medco, demanded additional pricing concessions on Nexium, threatening not to add Nexium to the Highmark formulary if its demands were not met.

48.    As in 2000 with regard to Prilosec, on information and belief, AZ ascertained that it could not discount Nexium to the extent demanded without owing substantial additional rebates on Nexium to the Medicaid Program.  However, on information and belief, AZ offered, and thereafter committed, to pay Medco a total of approximately $200,000 for mailings to physicians and pharmacies describing Nexium's addition to Highmark's formulary, telephone interventions promoting switches to Nexium, certain clinical mailings, and the installation of a Nexium website.

49.    On information and belief, AZ's $200,000 payment covered services that Highmark would otherwise have had to fund itself.  These services were provided by Medco to Highmark at no, or reduced, cost, due to AZ's subsidization of the same, as part of a quid pro quo arrangement to put Nexium on the Highmark formulary.

50.    Additionally, on information and belief, Medco's cost of providing the services to AZ was minimal enough that the $200,000 fee was exorbitant in relation to such cost.  Thus, on information and belief, Medco also benefited from AZ's $200,000 services payment, in addition to Highmark, in exchange for Medco's assistance in enabling AZ to avoid its "best price" reporting obligations with respect to Nexium.

51.    At all times material hereto, Medco and AZ understood that cash discounts, or free goods related to purchase agreements, regarding given pharmaceuticals are expressly required to be included in the determination of "best price" for those pharmaceuticals.

52.    AZ knowingly excluded the $200,000 gift of services to Highmark, which was part of a quid pro quo arrangement to place and promote Nexium on Highmark's formulary, from its "best price" for Nexium; knowingly submitted false records or statements to HCFA regarding its "best price" for Nexium by excluding the $200,000 services payment to Medco; and knowingly underpaid rebates on Nexium to the Medicaid Program.

53.    Medco aided and abetted AZ in knowingly excluding the $200,000 fee for services from AZ's "best price" for Nexium; aided and abetted AZ in knowingly submitting false records or statements to HCFA regarding AZ's "best price" for Nexium by excluding the $200,000 services payment to Medco; and aided and abetted AZ in knowingly underpaying rebates on Nexium to the Medicaid Program.  Further, Medco benefited greatly from its actions in so doing, given that its cost of providing the services to Highmark was far less than $200,000, on information and belief.

54.    As a result of AZ's promise to pay $200,000 to Medco for services to be provided to Highmark, as above described, on information and belief, Medco and Highmark added Nexium to Highmark's formulary.  The promised services were subsequently funded by AZ, and provided to Highmark by Medco.

55.    The $200,000 gift of services related to Nexium's inclusion on the Highmark formulary implicates the AKA because it was provided to ensure the promotion and purchase of AZ's drug, Nexium, thereby inducing Highmark's customer plans, including federally-funded programs, to purchase Nexium.

56.     Once Nexium came out, one of its competitor drugs was Protonix, manufactured by Wyeth Pharmaceuticals.   On information and belief, after Nexium was placed on its formulary, Highmark was approached by Wyeth regarding the addition of Protonix, Wyeth's drug, to its formulary.  AZ was subsequently notified of Wyeth's interest in adding Protonix by personnel at either Highmark or Medco.

57.     AZ was anxious to prevent competition from Protonix, and other, like drugs. Accordingly, representatives from AZ met with personnel at Medco and Highmark regarding this new threat, and what it would take to prevent the addition of competitor heartburn drugs to Highmark's formulary, in order to ensure that Nexium's market share and sales did not diminish. During negotiations, Highmark, through Medco, sought yet more discounts on Nexium from AZ.

58.     AZ knew that it could not further discount Nexium without owing substantial additional rebates to the Medicaid program, but offered to pay another $200,000 to Medco to subsidize the provision of Medco's RationalMed program to Highmark, in exchange for Highmark's promise to help retain Nexium's market share by not adding Protonix to its formulary.

59.     RationalMed is a program that profiles physicians' prescribing habits, examines potential adverse reactions between prescribed drugs, and notifies physicians of such potential adverse reactions and alternate drugs that could be prescribed for the conditions in question. Under normal conditions, Medco's members are charged a fee of $4.00 per member, per year, whenever they are provided with the RationalMed program.

60.     After AZ committed to paying Medco $200,000 to provide RationalMed to Highmark, at no cost to Highmark, Highmark agreed not to add Protonix to its formulary, in order to retain Nexium's market share.

61.     At all times material hereto, Medco and AZ understood that free goods that are contingent upon purchase requirements are expressly required to be included in the determination of "best price" for the affected drugs.

62.     Nonetheless, AZ knowingly excluded its $200,000 payment for the provision of Medco's RationalMed program to Highmark from AZ's "best price" on Nexium; knowingly submitted false records or statements to HCFA regarding its "best price" for Nexium by excluding the $200,000 payment to Medco for provision of RationalMed to Highmark; and knowingly underpaid rebates on Nexium to the Medicaid Program.

63.     Medco aided and abetted AZ in knowingly excluding the $200,000 payment for provision of Medco's RationalMed program to Highmark from AZ's "best price" on Nexium; aided and abetted AZ in knowingly submitting false records or statements to HCFA regarding AZ's "best price" for Nexium by excluding the $200,000 payment to Medco for provision of RationalMed to Highmark; and aided and abetted AZ in knowingly underpaying rebates on Nexium to the Medicaid Program.

64.     Further, the $200,000 subsidization of RationalMed related to promoting Nexium on the Highmark formulary, and preventing the erosion of its market share, implicates the AKA because it was provided to ensure the promotion of AZ's drug, Nexium, thereby inducing Highmark's customer plans, including federally-funded programs, to purchase Nexium.

**Colazal:  False Claims Regarding Best Price and Kickbacks**

65.     Because of Highmark's size, and its formulary's prominence, it was important to Salix to get its product, Colazal, which is a drug used to treat inflammation of the bowels, on Highmark's formulary. Colazal was Salix's first marketed product. Salix launched the product in the United States through its specialty sales force in January 2001.

66.     Salix tried, on information and belief, to get Colazal on the Highmark formulary for most of the year 2002. For example, in early 2002 or late 2001, representatives from Salix met with senior Medco contracting personnel regarding the potential addition of Colazal to Highmark's formulary. During these meetings, draft rebate agreements were crafted, and subsequently presented to Highmark. On at least two different occasions during the second and third quarters of 2002, Highmark refused to add Colazal to Highmark's formulary.

67.     Thereafter, on information and belief, Salix analyzed its options for providing additional pricing concessions on Colazal to Highmark, but ascertained that it could not do so without owing substantial additional rebates on Colazal to the Medicaid program.

68.     However, as with AZ, Salix offered, instead, to subsidize the provision of Medco's RationalMed program to Highmark's members. This offer was made, on information and belief, in the fourth quarter of 2002.

69.     Thereafter, on or about December 18, 2002, a proposal was drafted whereby Salix promised to sponsor RationalMed for Highmark at a cost of $60,000 per year.

70.     Effective January 1, 2003, Colazal was added to Highmark's formulary. On information and belief, Colazal was added as a result of Salix's payment of $60,000 to subsidize the provision of RationalMed to Highmark members from January of 2003 to December of 2004.

71.     At all times material hereto, Medco and Salix understood that free goods that are contingent upon purchase requirements are expressly required to be included in the determination of "best price."

72.     Regardless, on information and belief, from January of 2003 to the present, Salix has knowingly excluded the $60,000 payment for provision of Medco's RationalMed program to Highmark from its "best price" on Colazal; has knowingly submitted false records or statements

18

to HCFA regarding its "best price" for Colazal by excluding the $60,000 payment to Medco for provision of RationalMed to Highmark; and has knowingly underpaid rebates on Colazal to the Medicaid Program.

73.     On information and belief, from January of 2003 to the present, Medco has aided and abetted Salix in knowingly excluding its $60,000 payment for provision of Medco's RationalMed program to Highmark from Salix's "best price" on Colazal; has aided and abetted Salix in knowingly submitting false records or statements to HCFA regarding Salix's "best price" for Colazal by excluding the $60,000 payment to Medco for provision of RationalMed to Highmark; and has aided and abetted Salix in knowingly underpaying rebates on Colazal to the Medicaid Program.

74.     Further, the $60,000 subsidization of RationalMed related to Colazal's inclusion on the Highmark formulary implicates the AKA because it was provided to ensure the placement and promotion of Salix's drug, Colazal, thereby inducing Highmark's customer plans, which include federally-funded programs, to purchase Colazal.

### DuPont's and BMS' Payment of Kickbacks to Ensure Coumadin's "House Brand" Status

75.     DuPont's brand name drug, Coumadin, an anticoagulant used to reduce the formation of blood clots, has a narrow therapeutic index ("NTI"), but was nonetheless challenged via the advent of generic competitors on the market in or around 1996-97.

76.     In response, during 1997, representatives from DuPont approached Medco about maintaining Coumadin's placement on Medco's formularies, and securing Coumadin's status as Medco's "house brand" pharmaceutical dispensed via its mail program.

77.     If a brand drug is denoted Medco's "house brand," that means that any script that comes in for another drug, even a generic drug, within the same therapeutic category, will be

19

filled with the "house brand" drug. This enables the "house brand" drug's manufacturer to slow the erosion of the drug's market share to generics, and ensure revenue for its brand.

78.     Medco's mail service pharmacy is the largest in the country. By way of example, it serviced 53 million prescriptions in 1998. Thus, by ensuring that Coumadin was Medco's "house brand" at mail, DuPont ensured that Coumadin would be able to retain an abnormal amount of market share despite generic competition, thereby continuing to generate profits for DuPont.

79.     During the negotiations between DuPont and Medco, on information and belief, Medco demanded additional monies, beyond the rebates paid for Coumadin, in exchange for utilizing Coumadin as Medco's "house brand" at mail. In response, DuPont's representatives agreed to pay additional monies to Medco in the form of "data fees," to ensure Coumadin's use as Medco's "house brand" at mail.

80.     Thereafter, effective December 1, 1997, Medco and DuPont entered into a "Coumadin Data Purchase Agreement." This agreement was amended on January 1, 1999, (contract #407416-000.01), and again on January 1, 2000 (contract #407416-000.02). It was also extended up to and including March 31, 2003, on information and belief.

81.     On information and belief, the payments made for data under the "Coumadin Data Purchase Agreement" were exorbitant given that Medco's expenses related to the generation of the data "sold" were negligible, since the data provided was data that Medco had anyway. For example, for the time period of January 1, 2001 through and including March 31, 2003, on information and belief, the "Data Payments" made pursuant to the "Coumadin Data Purchase Agreement" were $1,000,000 per quarter, or approximately $9,000,000 total.

82.   In exchange for the "data fees" paid by DuPont, Medco used Coumadin as its "house brand" at mail, refusing to dispense any generic version of the drug via its mail program.

83.   On information and belief, Coumadin was more expensive than its generic competitors, such that Medco's use of Coumadin as its "house brand" at mail caused Medco's customers, including its federal and state/local plan customers, to incur additional expense.

84.   In or around January of 2001, BMS bought Coumadin from DuPont, and also bought the existing "Coumadin Data Purchase Agreement" between DuPont and Medco. BMS carried through this existing contract, and, in fact, extended it to March 31, 2003, guaranteeing Medco $1,000,000 quarterly "Data Payments" throughout that extension period, in order to retain Coumadin's status as Medco's "house brand" at mail.

85.   During the extension period, in exchange for the $1,000,000 quarterly "Data Payments," Medco continued dispensing Coumadin as its "house brand" at mail, at the expense of its customers, including federal and state/local government plans.

86.   DuPont's and BMS' "Data Payments," which were merely cash payments made to ensure Coumadin's use as Medco's "house brand" at mail, and Medco's receipt of those "Data Payments," constitute violations of the AKA, given that the "Data Payments" were made to induce, and, in fact, ensure that Medco's customers, including its federal and state/local government plans, purchased only Coumadin when using Medco's mail service pharmacies. The payment and receipt of these kickbacks, and Medco's resulting conduct, resulted in increased expense to Medco's federal and state/local government plan customers.

87.   DuPont's and BMS' payment, and Medco's receipt, of kickbacks made to induce federal and state/local government plan payments for Coumadin through a pattern of corrupt and

illegal conduct constitute violations of the federal False Claims Act, 31 U.S.C. § 3729, and its state law counterparts.

### Glaxo's Payment of Kickbacks to Ensure Zantac's "House Brand" Status

88.     In or about 1997, Glaxo contacted Medco, seeking to have its brand drug Zantac, which is used for heartburn, established as Medco's "house brand" via mail, like Coumadin. Glaxo's objective in so doing was to reduce erosion of Zantac's market share, since it had recently lost its patent protection and generic versions of the drug were coming on the market.

89.     During the negotiations, Glaxo offered Medco significant cash discounts if Medco agreed to use Zantac as its "house brand" for the next four years, and agreed to certain volume purchase commitments.

90.     On information and belief, the significant discounts given to Medco were provided strictly in exchange for Medco's agreement to purchase large quantities of Zantac at regular intervals for dispensing via its mail program.

91.     On or about January 1, 1997, Glaxo and Medco entered into an Agreement that memorialized Glaxo's promise to provide Medco these cash discounts, upon information and belief, in exchange for Medco's promise to purchase a specified amount of Zantac, on a quarterly or annual basis, for four years, and to use the same as its "house brand" at mail. This Agreement was subsequently amended on October 1, 1997, December 31, 2000, and April 1, 2001, and was still in effect, at least to some degree, as of December 12, 2001.

92.     In exchange for the discount monies paid by Glaxo pursuant to the Agreement, Medco made large purchases of Zantac at regular intervals and utilized Zantac as its "house brand" at mail, refusing to dispense any generic version of the drug through its mail program.

93.     Zantac was more expensive than its generic versions, on information and belief, such that Medco's use of Zantac as its "house brand" at mail caused its customers, including federal and state/local government plans, to incur additional expense.

94.     Glaxo's payments of cash discounts on Zantac to Medco, conditioned on Medco's use of Zantac as its "house brand" at mail, and Medco's receipt of the same, constitute violations of the AKA, given that the discount payments were made to induce, and, in fact, ensure that Medco's customers, including its federal and state/local government plans, purchased only Zantac when using Medco's mail service pharmacies, at such plans' increased expense.

95.     Glaxo's payment, and Medco's receipt, of these kickbacks made to induce federal and state/local government plan payments for Zantac as part of a pattern of corrupt and illegal conduct constitute violations of the federal False Claims Act, 31 U.S.C. § 3729, and its state law counterparts.

## PHS Liability

96.     AZ and Salix required PHS entities to pay for drugs, including Prilosec, Nexium and Colazal, at prices that were derived, in part, from the amount of the Medicaid rebates paid for those drugs in the preceding calendar year.  As a result, when AZ and Salix knowingly excluded off-invoice cash discounts, rebates, or other payments, or the cost of free goods contingent upon purchase requirements, made or given to Medco or its client, Highmark, from their determination of "best price" for the subject drugs, and knowingly underpaid Medicaid rebates, the PHS entities were overcharged for their purchases of AZ's and Salix's drugs, including Prilosec, Nexium and Colazal.

97.     Accordingly, AZ and Salix were unjustly enriched when they overcharged PHS entities for their purchases of Prilosec, Nexium and Colazal.

23

**COUNT I**

**<u>VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729</u>**

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

98.     This is a civil action brought by Plaintiff, relator, on behalf of the United States of America against the defendants under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

99.     The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented, or caused to be presented, and may still be presenting or causing to be presented, to Medicaid, Medicare, FEHBP, and other federally funded health insurance programs, false or fraudulent claims for payment, in violation of, inter alia, 31 U.S.C. § 3729 (a)(1).

100.     The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, caused, or caused to be used, and may still be using or causing to be used, false or fraudulent records and/or statements to get false or fraudulent claims paid in violation of, inter alia, 31 U.S.C. § 3729(a)(2).

101.     Defendant Medco conspired with the defendant manufacturers and others to defraud the Government by having false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3).

102.     The defendants in reckless disregard or deliberate ignorance of the truth or falsity of the information which supported claims to Medicare, Medicaid, FEHBP or other federally funded health insurance programs, or with actual knowledge of the falsity of the information that supported these claims, caused, and may still be causing, the use of false or fraudulent materials or information to support claims paid by the government.

103.     The United States of America, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying for prescription drugs and prescription drug-related management services for recipients of federally funded health insurance programs.

104.     As a result of the defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

105.     The defendants' actions, as described above, caused the government to receive less than the "best price" for prescription drugs, to which the government was entitled.   42 U.S.C. § 1396r-8(b)(3)(C)(ii) provides for a $100,000 penalty for each item of false information.

106.     Penalties should be assessed against defendants for each rebate calculation, for each drug, for each dosage, for each state, for each governmental entity, and for each quarter that defendants reported, or caused to be reported, false information regarding the "best price" of prescription drugs.

## COUNT II

## <u>VIOLATION OF THE STATE OF CALIFORNIA FALSE CLAIMS ACT</u>

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

107.     This is a civil action brought by Plaintiff, relator, on behalf of the State of California against the defendants under the California False Claims Act, CAL. CODE § 12652(c).

108.     The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to,

an officer or employee of the State of California or its political subdivisions false or fraudulent claims for payment, in violation of CAL. CODE § 12651(a)(1).

109.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent paid in violation of CAL. CODE § 12651(a)(2).

110.    Defendant Medco conspired with the defendant manufacturers and others to defraud the State of California, or its political subdivisions, by getting false or fraudulent claims allowed or paid by the state or its political subdivisions in violation of CAL. CODE § 12651(a)(3).

111.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of CAL. CODE § 12651(a)(7).

112.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

113.   As a result of the defendants' actions, as set forth above, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT III

### VIOLATION OF THE STATE OF DELAWARE
### FALSE CLAIMS AND REPORTING ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

114.   This is a civil action brought on behalf of Plaintiff, relator, on behalf of the Government of the State of Delaware against the defendants under the State of Delaware's False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1203(b).

115.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(1).

116.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(1).

117.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(2).

118.    Defendant Medco conspired with the defendant manufacturers and others to defraud the Government of the State of Delaware by getting false or fraudulent claims allowed or paid, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(3).

119.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the Government of Delaware, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(7).

120.    The Government of the State of Delaware, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health care programs funded by the Government of the State of Delaware.

121.    As a result of the defendants' actions, the Government of the State of Delaware has been, and may continue to be, severely damaged.

## COUNT IV

## VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

122.   This is a civil action brought by Plaintiff, relator, in the name of the District of Columbia against the defendants under the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.15(b).

123.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. CODE ANN. § 2-308.14(a)(1).

124.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records and/or statements to get false claims paid or approved by the District, in violation of D.C. CODE ANN. § 2-308.14(a)(2).

125.   Defendant Medco has conspired with the defendant manufacturers and others to defraud the District by getting false claims allowed or paid by the District, in violation of D.C. CODE ANN. § 2-308.14(a)(3).

126.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, in violation of D.C. CODE ANN. § 2-308.14(a)(7).

127.    The District of Columbia, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

128.    As a result of the defendants' actions, as set forth above, the District of Columbia has been, and continues to be, severely damaged.

## COUNT V

## VIOLATION OF THE STATE OF FLORIDA FALSE CLAIMS ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

129.    This is a civil action brought by Plaintiff, relator, on behalf of the State of Florida against the defendants under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

130.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

131.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

132.    Defendant Medco conspired with the defendant manufacturers and others to submit a false or fraudulent claim to the State of Florida or one of its agencies, or to deceive the State of Florida or one of its agencies for the purpose of getting a false or fraudulent claim allowed or paid, in violation of FLA. STAT. ANN. § 68.082(2)(c).

133.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(g).

134.    The State of Florida and its agencies, unaware of the falsity of the claims and/or statements  made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

135.    As a result of the defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT VI

### VIOLATION OF THE STATE OF HAWAII FALSE CLAIMS ACT
### FALSE CLAIMS TO THE STATE

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

136. This is a civil action brought by Plaintiff, relator, on behalf of the State of Hawaii and its political subdivisions against the defendants' under the State of Hawaii's False Claims Act – False Claims to the State, HAW. REV. STAT. § 661-25.

137. The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of HAW. REV. STAT. § 661-21(a)(1).

138. The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(2).

139. Defendant Medco conspired with the defendant manufacturers and others to defraud the State of Hawaii or its political subdivisions by getting false or fraudulent claims allowed or paid, in violation of HAW. REV. STAT. § 661-21(a)(3).

140. The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(7).

32

141.   The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

142.   As a result of the defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT VII

### VIOLATION OF THE STATE OF ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

143.   This is a civil action brought by Plaintiff, relator, on behalf of the State of Illinois against the defendants under the State of Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. 175/4(b).

144.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or fraudulent claim for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1).

145.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing

33

to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(2).

146.    Defendant Medco conspired with the defendant manufacturers and others to defraud the State of Illinois by getting false or fraudulent claims allowed or paid, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(3).

147.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(7).

148.    The State of Illinois, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

149.    As a result of the defendants' actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

## COUNT VIII

### VIOLATION OF THE STATE OF LOUISIANA
### MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

34

150.    This is a civil action brought by Plaintiff, relator, on behalf of the State of Louisiana's medical assistance programs against the defendants under the State of Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 439.1.

151.    The defendants have solicited or received remuneration, including but not limited to kickbacks, bribes or rebates, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the medical assistance programs, in violation of LA. REV. STAT. § 438.2(A)(2).

152.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of LA. REV. STAT. § 438.3(A).

153.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of LA. REV. STAT. § 438.3(B).

154.    Defendant Medco has conspired with the defendant manufacturers and others to defraud, or attempt to defraud, medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for false or fraudulent claims, in violation of LA. REV. STAT. § 438.3(C).

155.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by the

defendants, or its actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of the defendants' claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

156.    As a result of the defendants' actions, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT IX**

**<u>VIOLATION OF THE STATE OF MASSACHUSETTS FALSE CLAIMS ACT</u>**

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

157.    This is a civil action brought by Plaintiff, relator, on account of the Commonwealth of Massachusetts against the defendants under the Massachusetts False Claims Act, MASS. LAWS ANN. ch. 12, § 5C(2).

158.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MASS. LAWS ANN. ch. 12, § 5B(1).

159.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the

Commonwealth of Massachusetts or its political subdivisions in violation of MASS. LAWS ANN. ch. 12, § 5B(2).

160.   Defendant Medco conspired with the defendant manufacturers and others to defraud the Commonwealth of Massachusetts or its political subdivisions through the allowance or payment of fraudulent claims in violation of MASS. LAWS ANN. ch. 12, § 5B(3).

161.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly entered into an agreement, contract, or understanding with one or more officials of the Commonwealth of Massachusetts or its political subdivisions with knowledge that the information contained in said agreement, contract or understanding was false, in violation of MASS. LAWS ANN. ch. 12, § 5B(7).

162.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of MASS. GEN. LAWS ch. 159, s 18, § 5B(8).

163.   The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

164.    As a result of the defendants' actions, as set forth above, the Commonwealth of

Massachusetts or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X

### VIOLATION OF THE STATE OF NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT

165.    This is a civil action brought by Plaintiff, relator, on account of the State of

Nevada against the defendants under the State of Nevada Submission of False Claims to State or

Local Government Act, NEV. REV. STAT. ANN. § 357.080(1).

166.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented or caused to be presented, and may still be presenting or causing to be

presented, a false claim for payment or approval, in violation of NEV. REV. STAT. ANN. §

357.040(1)(a).

167.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to obtain payment or approval for false claims in

violation of NEV. REV. STAT. ANN. § 357.040(1)(b).

168.    Defendant Medco conspired with the defendant manufacturers and others to

defraud the State of Nevada or its political subdivisions by obtaining allowance or payment of a

false claim in violation of NEV. REV. STAT. ANN. § 357.040(1)(c).

169.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing

38

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, in violation of NEV. REV. STAT. ANN. § 357.040(1)(g).

170.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

171.    As a result of the defendants' actions, as set forth above, the State of Nevada or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XI**

**<u>VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT</u>**

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

172.    This is a civil action brought by Plaintiff, relator, on behalf of the State of Tennessee against the defendants under the Tennessee False Claims Act, TENN. CODE ANN. § 4-18-104(c).

173.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Tennessee, or its political subdivisions, false claims for payment or approval, in violation of TENN. CODE ANN. § 4-18-103(a)(1).

174.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

39

knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false claims paid or approved by the state or its political subdivisions in violation of TENN. CODE ANN. § 4-18-103(a)(2).

175.    Defendant Medco has conspired with the defendant manufacturers and others to defraud the State of Tennessee, or its political subdivisions, by getting false claims allowed or paid by the state or its political subdivisions in violation of TENN. CODE ANN. § 4-18-103(a)(3).

176.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay money to the State of Tennessee or its political subdivisions, in violation of TENN. CODE ANN. § 4-18-103(a)(7).

177.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or its political subdivisions, in violation of TENN. CODE ANN. § 4-18-103(a)(9).

178.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

40

179.   As a result of the defendants' conduct, as set forth above, the State of Tennessee or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XII

### VIOLATION OF THE STATE OF TENNESSEE
### MEDICAID FALSE CLAIMS ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

180.   This is a civil action brought by Plaintiff, relator, in the name of the State of Tennessee against the defendants under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-183(a).

181.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee a claim for payment under the Medicaid program knowing it was false or fraudulent, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(A).

182.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(B).

183.   Defendant Medco conspired with the defendant manufacturers and others to defraud the State of Tennessee by getting a claim allowed or paid under the Medicaid program

41

with knowledge that such claim was false or fraudulent, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(C).

184.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, relative to the Medicaid program, with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

185.   The State of Tennessee, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

186.   As a result of the defendants' actions, as set forth above, the State of Tennessee has been, and may continue to be, severely damaged.

**COUNT XIII**

**VIOLATION OF THE STATE OF TEXAS HUMAN RESOURCES CODE**

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

187.   This is a civil action brought by Plaintiff, relator, in the name of the State of Texas against the defendants under the State of Texas Human Resources Code, Medicaid Fraud Prevention Chapter, TEX. HUM. RES. CODE § 36.101(a).

188.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be

42

made, a false statement or misrepresentation of material fact on an application for a contract, benefit or payment under a Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(1)(A).

189.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact that is intended to be used, and has been used, to determine a person's eligibility for a benefit or payment under the Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(1)(B).

190.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event that it knows affects its continued right to a benefit or payment under the Medicaid program in violation of TEX. HUM. RES. CODE § 36.002(2)(A)(i).

191.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit authorized in violation of TEX. HUM. RES. CODE § 36.002(2)(B).

192.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, caused to be made, induced or sought to induce, and may still

43

be making, causing to be made, inducing or seeking to induce, the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of TEX. HUM. RES. CODE § 36.002(4)(B).

193.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally charged, solicited, accepted or received, and may still be charging, soliciting, accepting or receiving, in addition to amounts paid under the Medicaid program, gifts, money, donations, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient when the cost of the service provided to the Medicaid recipient was paid for, in whole or in part, under the Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(5).

194.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made a claim under the Medicaid program for a service or product that was inappropriate, in violation of TEX. HUM. RES. CODE § 36.002(7)(C).

195.    Defendant Medco knowingly and intentionally entered into agreements, combinations or conspiracies with the defendant manufacturers and others to defraud the State of Texas, its political subdivisions or the Department by obtaining, or aiding each other in obtaining, an unauthorized payment or benefit from the Medicaid program or its fiscal agents, in violation of TEX. HUM. RES. CODE § 36.002(9).

196.    The State of Texas, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance on the accuracy of

44

these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

197.    As a result of the defendants' actions, as set forth above, the State of Texas, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## COUNT XIV

### VIOLATION OF THE COMMONWEALTH OF VIRGINIA
### FRAUD AGAINST TAXPAYERS ACT

Plaintiff incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth.

198.    This is a civil action brought by Plaintiff, relator, on behalf of the Commonwealth of Virginia against the defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.5.

199.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of VA. CODE ANN. § 8.01-216.3(A)(1).

200.    The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(2).

201.   Defendant Medco has conspired with the defendant manufacturers and others to defraud the Commonwealth by getting false or fraudulent claims allowed or paid, in violation of VA. CODE ANN. § 8.01-216.3(A)(3).

202.   The defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(7).

203.   The Commonwealth of Virginia, unaware of the falsity of the claims and/or statements made by the defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

204.   As a result of the defendants' actions, as set forth above, the Commonwealth of Virginia has been, and may continue to be, severely damaged.

**WHEREFORE**, Plaintiff prays for judgment against the defendants as follows:

A.     that the defendants be ordered to cease and desist from submitting any more false claims to Government Programs, or further violating 31 U.S.C. § 3729, CAL. CODE § 12650, *et seq.*, DEL. CODE ANN. tit. 6, § 1201, *et seq.*, D.C. CODE ANN. § 2-308.13, *et seq.*, FLA. STAT. ANN. § 68.081, *et seq.*, HAW. REV. STAT. § 661-21, *et seq.*, 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*, LA. REV. STAT § 437.1, *et seq.*, MASS. LAWS ANN. ch. 12, §5A, *et seq* , NEV. REV. STAT. ANN. § 357.010, *et seq.*, TENN. CODE ANN. § 4-18-101, *et seq.*, TENN. CODE ANN. § 71-5-181, *et seq.*, TEX. HUM. RES. CODE § 36.001, *et seq.*, and. VA. CODE ANN. § 8.01-216.1, *et seq.*

B.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of each and every false or fraudulent claim multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.      that Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), CAL. CODE § 12652(g), DEL. CODE ANN. tit. 6, § 1205, D.C. CODE ANN. § 2-308.15(f), FLA. STAT. ANN. § 68.085, HAW. REV. STAT. § 661-27, 740 ILL. COMP. STAT. ANN. 175/4(d), LA. REV. STAT § 439.4, MASS. GEN. LAWS ch. 159, s 18, § 5F., NEV. REV. STAT. ANN. § 357.220, TENN. CODE ANN. § 4-18-104(g)(1), TENN. CODE ANN. § 71-5-183(c), TEX. HUM. RES. CODE § 36.110, and VA. CODE ANN. § 8.01-216.7,

D.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in CAL. CODE § 12651(a), plus a civil penalty of no more than ten thousand dollars ($10,000) per claim as provided by CAL. CODE § 12651(a), to the extent such multiplied penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the Government of the State of Delaware multiplied as provided for in DEL. CODE ANN. tit. 6, § 1201(a), plus a civil penalty of not less than five

thousand five-hundred dollars ($5,500) or more than ten thousand dollars ($11,000) for each act in violation of the State of Delaware False Claims and Reporting Act, as provided by DEL. CODE ANN. tit. 6, § 1201(a), to the extent such multiplied penalties shall fairly compensate the Government of the State of Delaware for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.     that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. CODE ANN. § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. CODE ANN. § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

G.     that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in FLA. STAT. ANN. § 68.082, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by FLA. STAT. ANN. § 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.     that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in HAW.

REV. STAT. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by HAW. REV. STAT. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 ILL. COMP. STAT. ANN. 175/3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000), and the costs of this civil action brought to recover such damages and penalty, as provided by 740 ILL. COMP. STAT. ANN. 175/3(a), to the extent such multiplied penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in LA. REV. STAT § 438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by LA. REV. STAT § 438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by LA. REV. STAT §. 438.6(C)(1)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of s. 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by LA. REV. STAT §  438.6(C)(1)(b), to the

extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

      K.    that judgment be entered in Plaintiff's favor and against the defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of the defendants' unlawful acts, as provided for in MASS. LAWS ANN. ch. 12, § 5B, multiplied as provided for in MASS. LAWS ANN. ch. 12, § 5B, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to MASS. LAWS ANN. ch. 12, § 5B, to the extent such multiplied penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

      L.    that judgment be entered in Plaintiff's favor and against the defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of the defendants' unlawful acts, as provided for in NEV. REV. STAT. ANN. 357.040, multiplied as provided for in NEV. REV. STAT. ANN. § 357.040(1), plus a civil penalty of not less than two thousand dollars ($2,000) or more than ten thousand dollars ($10,000) for each act, pursuant to NEV. REV. STAT. ANN. § 357.040, to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.     that judgment be entered in Plaintiff's favor and against the defendants for restitution to the State of Tennesee for the value of payments or benefits provided, directly or indirectly, as a result of the defendants' unlawful acts, as provided for in TENN. CODE ANN. § 4-18-103(a), multiplied as provided for in TENN. CODE ANN. § 4-18-103(a), plus a civil penalty of not less than two thousand five-hundred dollars ($2,500) or more than ten thousand dollars ($10,000) for each false claim, pursuant to TENN. CODE ANN. § 4-18-103(a), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.     that judgment be entered in Plaintiff's favor and against the defendants for restitution to the State of Tennesee for the value of payments or benefits provided, directly or indirectly, as a result of the defendants' unlawful acts, as provided for in TENN. CODE ANN. 71-5-182, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(1), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.     that judgment be entered in Plaintiff's favor and against the defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in TEX. HUM. RES. CODE § 36.052(a)(1), multiplied as provided for in TEX. HUM. RES. CODE § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the

51

day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to TEX. HUM. RES. CODE § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to TEX. HUM. RES. CODE § 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.      that judgment be entered in Plaintiff's favor and against the defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in VA. CODE ANN. § 8.01-216.3(A), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by VA. CODE ANN. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by the defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.      that judgment be granted for Plaintiff and against the defendants for any costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit; and

R.      that Plaintiff be granted such other and further relief as the Court deems just and proper.

Dated: September 26, 2003    By:_____

Arthur M. Kaplan
FINE, KAPLAN AND BLACK, R.P.C.
1845 Walnut Street
23rd Floor
Philadelphia, PA 19103-4723
Telephone: (215) 567-6565
Facsimile: (215) 568-5872

Attorneys for Plaintiff/Relator Karl S. Schumann

Of Counsel:
W. Scott Simmer
Bruce A. Finzen
Thomas J. Poulin
Kathleen D. Pitzer
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
1801 K Street, N.W.
Suite 1200
Washington, D.C. 20006
Telephone: (202) 775-0725
Facsimile: (202) 223-8604